IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ZELL BRADLEY, III**,

    Plaintiff,

vs.

**COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION**,

    Defendant.

Civil Case No. 09-5-KI

OPINION AND ORDER

  Merrill Schneider
  Schneider Law Offices
  14415 SE Stark
  P. O. Box 16310
  Portland, Oregon  97292

    Attorney for Plaintiff

  Dwight C. Holton
  Acting United States Attorney
  District of Oregon

Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204

David R. Johnson
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900 M/S 901
Seattle , Washington  98104

       Attorneys for Defendant

KING, Judge:

Plaintiff Zell Bradley brings this action pursuant to section 405(g) of the Social Security Act (the "Act") to obtain judicial review of a final decision of the Commissioner denying his application for disability insurance benefits ("DIB").  I reverse and remand the decision for further development of the record.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the

past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The Administrative Law Judge ("ALJ") found that Bradley had no severe impairments at step two of the sequential analysis. The ALJ did not, therefore, perform additional steps in the sequential analysis or make findings as to Bradley's residual functional capacity. The ALJ did note, however, that Bradley testified he could lift and carry ten pounds occasionally; he was able

Page 4 - OPINION AND ORDER

to stand for up to three hours during eight hours; he was able to sit without limitation so long as his leg was elevated; and he was able to walk up to three hours in an eight hour day.

## FACTS

Bradley, who was 49 years old at the time of the ALJ's decision, claims he was disabled for a closed period of time between February 2004 and December 2005 based on a severe ankle injury coupled with depression. Bradley, who has been homeless intermittently since the early 1990s, did not graduate from high school but earned a GED in 1977. Thereafter Bradley joined the Air Force, but was discharged after roughly nineteen months. He has worked many temporary jobs over the last two decades, most of which involve telephone customer support or clerical filing duties.

As a child, Bradley was subject to at least one incident of severe sexual abuse. His father was in the Air Force and the family moved often. Bradley's parents were both alcoholics, and his father was "physically and mentally abusive to the entire family." Tr. 649. As an adult, Bradley developed a history of polysubstance use, and has repeatedly engaged in treatment for his addictions, only to relapse during stressful times. Bradley has a criminal history that includes various drug-related charges, assault, DUI, robbery and multiple parole violations. He was incarcerated for a total of four years for his criminal acts. Bradley has one son with whom he has no contact.

Bradley also has a history of depression and other mental illnesses. Dr. Kristen Snyder noted that Bradley had multiple hospital "admissions for complaints of depression," that he had been on a number of antidepressants over the years, and that he had at least two suicide attempts, "one in 2000 where he again jumped into traffic and one in 2003 when he attempted to

[overdose]." Tr. 648. In February 2003, Dr. Beverly Young diagnosed Bradley with dysthymia, post traumatic stress disorder, polysubstance dependence, and major depression. Tr. 299.

On February 28, 2004, Bradley sustained a compound fracture in his left ankle when he fell off a ledge about four feet high while intoxicated. The fracture was severe, leaving his bones in "several large fragments." Tr. 569. On March 9, 2004, doctors at the Veteran's Administration Hospital ("VA Hospital") in Portland, Oregon surgically implanted metal plates and screws in Bradley's ankle, including an external metal fixator that protruded from Bradley's foot. In Bradley's words, the fixator made him "look like Robocop." Tr. 1913. Bradley could not walk after the surgery, and used crutches or a wheelchair for at least eight months.

After being discharged from the hospital, Bradley lived in veteran transitional housing for a time and then lived in a shelter before temporarily finding housing together with his girlfriend. The housing was short-lived, however, as the record indicates that Bradley and his girlfriend were evicted prior to June 15, 2004. During the same period, Bradley engaged in an outpatient substance abuse treatment program.

Bradley was admitted to the Southwest Washington Medical Center Emergency Room on June 15, 2004, after experiencing great pain, and again on June 20, 2004, after feeling dizzy. He was diagnosed with a chronic acute leg infection by Dr. Geraldine Stark. On June 21, 2004, Bradley was again admitted to the VA Hospital for a period of eight days because a culture of Bradley's tissue revealed a staph infection associated with his external fixator. During the hospital stay, Bradley underwent surgery to remove the external fixator. He was subsequently given a wheelchair and a special boot.

Bradley was readmitted to the hospital on July 23, 2004, for osteomyelitis (a type of infection) of the left ankle. He stayed in the hospital to complete a course of antibiotics until August 3, 2004. Afterwards Bradley lived in transitional housing before once again becoming homeless and living in a shelter, where he was unable to receive antibiotic treatments.

In a letter dated August 13, 2004, Bradley's primary care physician[1] at the VA Hospital set forth a history of Bradley's ankle problems, concluding that "Zell Bradley III will be unable to completely utilize his normal walking or standing mobility for the next 6 - 9 months." Tr. 415. In late August of 2004, after Bradley was forced by time limitations to leave a shelter, he became homeless once again and his "bag was stolen containing his medications, including effexor, quetiapine and antibiotics." Tr. 654. Bradley was admitted to the hospital once again on September 4, 2004 after experiencing suicidal ideation. He told Dr. Kristen Snyder that he felt "like a failure" and "wanted [his] head smashed." Tr. 654.

On September 30, 2004, Dr. John Dryden, the acting chief of staff at the VA Hospital wrote a letter to Mr. Bradley. It read, in part,

> Treating your complex and psychiatric conditions (post-operative ankle surgery infection, anemia, hepatitis C, depression, and hx of polysubstance abuse) has been difficult based on a number of factors. These include poor attendance at scheduled appointments, including those to address your ankle injury, infection, primary care and mental health and recent use of cocaine. This lack of participation and cooperation with treatment has resulted in 6 acute care hospitalizations in the past six months . . . There is grave concern that if you do not cooperate with treatment plans, you are at risk for loss of your leg, a life-

---

[1]Although obviously an official letter, the physician referenced him or herself as the primary care physician but signed his or her signature without also printing his or her name. Although it is not possible to be certain which doctor wrote the letter, the signature contains the capital letters J.E, which likely correspond with Dr. James Edwards, Bradley's attending physician during multiple hospital stays and the staff surgeon who operated on Bradley's ankle and oversaw his recovery.

Page 7 - OPINION AND ORDER

>    threatening infection or death . . . . Keeping scheduled appointments, taking
>    medications, following treatment plans as ordered, and refraining from the use of
>    illegal substances are essential for Dr. Bristol and others to provide you care in a
>    safe and effective manner. It is my understanding that since I received this
>    referral, you entered our Substance Abuse Treatment program . . . . This
>    information is encouraging.

Tr. 830. On October 28, 2004, Bradley read the letter, stating "there was nothing he disagreed with and that it clearly outlined legitimate concerns on [the hospital's] part." Tr. 829. Nevertheless, Bradley testified he sometimes missed medical appointments because of transportation problems. He explained that the hospital was over 11 miles from his residence, he had no car, and there was no public transportation in the rural town where he lived. He also pointed out that on at least one occasion, he did not complete a course of antibiotics because they were stolen.

On December 23, 2004, Bradley was admitted to the hospital for complaints of depressed mood and suicidal ideation again. He related to the attending physician, Dr. Kristen Snyder, that he had been clean for 100 days prior to December 22, but that after a disappointing encounter at the VA Hospital the previous day, he drank alcohol and used crack cocaine. The following morning, Bradley felt "acutely despondent with desire to die," and he intentionally stepped in front of a bus, which was able to stop before hitting him. Tr. 648. Even prior to relapsing, however, Bradley relayed that "he has been pursued and abducted in recent weeks by aliens. He is also conversing with squirrels in his local park, but was unable to locate his squirrels this week and is convinced the aliens killed them." Tr. 649-50. He stayed in the hospital until January 5, 2005. By the conclusion of his stay Bradley was "no longer voicing psychotic symptoms,

depressed mood, or suicidality" and he was "ambulating steadily with a cane and walking boot." Tr. 651.

By January of 2005, Bradley had entered into a health care agreement with the VA Hospital. Under the agreement, Bradley was obligated to participate in regular urine analysis and to attend the Hospital's Substance Abuse Treatment Program. After January 12, 2005, Bradley stopped attending the program and participating in urine analysis. On January 21, 2005, Bradley's primary care physician, Dr. Bristol, noted that Bradley "did not show for scheduled [*sic*] appointment." Tr. 735. There is very little information about Bradley's alleged disability during the final two months of the first year of disability, but Bradley testified that during January and February 2005, he had been "panhandling" for money, abusing alcohol, and "once a month [he] might have enough money to get some cocaine." Tr. 1919. On March 4, 2005, Bradley went to a hospital in Walla Walla seeking drug treatment. He successfully participated in in-patient drug treatment during March and April of 2005.

About one month after completing treatment, in June 2005, Bradley obtained employment from Wal-Mart. He worked as an overnight stocker through November 2005. According to Bradley, he resigned from the job at Wal-Mart in November 2005, because he was unable to perform the physical requirements of the job. The stocking job required that he regularly lift 50 pound bags. In Bradley's words, "I didn't do the best job. They kind of held on to me. I think they hung on to me because they didn't want to pay unemployment, but they kept pressuring me." Tr. 1890. While working at Wal-Mart, Bradley was issued warnings for his problems with attendance, but was never suspended without pay.

Page 9 - OPINION AND ORDER

In December 2005, Bradley obtained employment as a technical support representative with a company called Sikes. He held that position until March 2007, when Bradley relapsed once again and entered drug treatment.

## DISCUSSION

Bradley argues the court should reverse the ALJ's decision for three reasons. According to Bradley, the ALJ erred by finding Bradley's impairments to be non-severe at step two of the sequential analysis, improperly evaluated third party statements, and erred by finding that he performed substantial gainful activity between February 2004 and December 2005.

I.  Finding of Non-Severe Impairments at Step Two

"An impairment can be considered as not severe [at step two] only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." SSR 85-28; Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988). Step two is a de minimis screening device used to dispose of groundless claims and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is clearly established by medical evidence. Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005).

Here, the ALJ concluded that during the requested closed period, the claimant did not have a severe impairment or combination of impairments for twelve consecutive months. According to the ALJ, Bradley's impairments of his ankle injury and depression "caused only transient and mild symptoms and limitations, were well-controlled with treatment or are otherwise not adequately supported by the medical evidence in the record." Tr. 22.

In support of her conclusion, the ALJ cites medical records associated with Bradley's in-patient drug treatment in March 2005. At best, the cited records marginally support the ALJ's conclusion. Nevertheless, they are from a period beyond the twelve month anniversary of Bradley's injury, February 28, 2005. To further bolster her conclusion, the ALJ rejects the testimony of Bradley's companion and cites the testimony by Bradley's other friends in several Function Reports.

    A.    <u>ALJ Improperly Evaluated Third Party Statements</u>

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001).

The ALJ rejected the statements in the August 2004 Function Report submitted by Bradley's companion, Stephanie Baxter. Baxter reported that Bradley needed assistance in order to perform basic functions like bathing, dressing, or preparing meals. She also related that she performed all shopping on his behalf, pushed him around in his wheelchair, and that Bradley was "very limited in any physical [*sic*] demanding activities." Tr. 98. The ALJ rejected Baxter's statements because "[h]er statements contradict reports completed by the claimant's friends in December 2004." Tr. 23. According to the ALJ, Bradley's friends said he was able "to perform household chores, shop for food, complete errands and ride public transportation." Tr. 23.

The other Function Reports the ALJ cites, however, do not even remotely support the ALJ's characterizations of Bradley's functionality. On the contrary, the reports, completed in December 2004, paint a picture of a homeless man who "holds up a sign to get money" and whose "foot seems to be worse so he can't do physical stuff at all." Tr. 136, 141. In short, the

Page 11 - OPINION AND ORDER

Function Reports completed by Bradley's other friends support, not refute, the Function Report completed by Baxter. The ALJ, therefore, did not give germane reasons to disregard Baxter's testimony.

Third party statements aside, the record indicates that Bradley's depression was sufficiently severe that he was twice hospitalized for suicidal ideation during the twelve months following his ankle injury. His ankle injury was severe enough that doctors warned of amputation and he was hospitalized on several occasions for infection. Clearly, Bradley's symptoms were not "transient and mild" or "well-controlled with treatment." There is no question that the medical evidence in the record is sufficient to clear the low hurdle of finding a severe impairment at step two.

  B.  Drug Addiction Analysis

The ALJ's conclusion that Bradley's impairments were not severe was largely based on the ALJ's premise that Bradley's "substance abuse extended his recovery." Tr. 24. In her words, Bradley's "pattern of substance abuse, followed by drug and alcohol treatment, and sporadic employment overshadows the claimant's allegations of physical and mental impairments." Tr. 24. The ALJ deduced that the drug abuse was related to Bradley's existing ankle injury and depression, and therefore the ankle and depression were not severe in combination.

Such an analysis is improper at step two. At step two, and throughout the five-step process, the ALJ must evaluate the claimant "without separating out the impact of alcoholism or drug addiction." Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001). In other words, an ALJ must complete the five-step procedure before conducting a drug and alcohol abuse analysis to determine if substance abuse was material to the disability. Id. If the ALJ finds that

Page 12 - OPINION AND ORDER

the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is no need to proceed with the addiction analysis under 20 C.F.R. §§ 404.1535 or 416.935. Id. If the ALJ finds that the claimant is disabled and there is medical evidence of his or her drug addiction or alcoholism, then the ALJ should proceed under §§ 404.1535 or 416.935 to determine if the claimant would still be found disabled if he or she stopped using alcohol or drugs. Id.

Without the ALJ's analysis on the remainder of the five-step inquiry, it is impossible for the court to evaluate the ALJ's conclusion that Bradley could have performed work during the relevant period. The lack of information dictates that I remand this case for an evidentiary hearing. Aside from the drug and alcohol analysis, of particular interest to the court is the extent to which Bradley's ankle injury and depression prevented him from working during January and February of 2005.

## II.    The Requested Closed Period

In order to qualify for benefits, the claimant must show that his impairments were so functionally limiting as to prevent him from engaging in any substantial gainful activity ("SGA") for at least twelve consecutive months. See 42 U.S.C. § 423(d)(1)(A); Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1459 (9th Cir. 1995); 20 C.F.R. § 404.1509. Here, Bradley requested a closed period of February 28, 2004, through December 1, 2005. Although Bradley worked at Wal-Mart from June 2005 through November 2005, he argues that the employment was an unsuccessful work attempt ("UWA") and does not qualify as substantial gainful activity.

For a position to meet the definition of a UWA, there must be evidence of: (1) a significant break in the continuity of the claimant's work prior to the UWA; (2) the claimant must

Page 13 - OPINION AND ORDER

have stopped working or reduced his work and earnings below the SGA level because of his impairment; (3) the work period must have lasted for less than six months; and (4) the work performed during the UWA must have been discontinued or reduced to the non-SGA level. 20 C.F.R. § 404.1574(c).

Bradley's work at Wal-Mart does not qualify as a UWA because he did not "stop working . . . because of his impairment." At the hearing Bradley testified that he resigned from his work at Wal-Mart because he "couldn't do the job. [He] physically can't do it." Tr. 1890. Although it is possible that Bradley's statement was true, the physical impairment that made him unable to do the job was not his ankle problem. On November 15, 2005, Bradley visited neurosurgeon Dr. Justin Cetas who noted that Bradley "has noticed progressive loss of grip strength, neck pain, and shoulder pain over the last three months. The patient states that . . . while working as a stocker at Wal-Mart, he noticed he was less and less able to pick things up and fulfill his other job duties." Tr. 676. According to Dr. Cetas, the weakness likely had neuropathic origins.

Bradley does not argue that his neuropathic problems were an impairment, much less that a neuropathic impairment should be tacked to his ankle impairment and depression for purposes of determining the length of the closed period. Accordingly, I reject Bradley's argument that the Wal-Mart job was an unsuccessful work attempt.

///
///
///
///

Page 14 - OPINION AND ORDER

## CONCLUSION

Based on the record, the decision of the Commissioner is reversed. The case is remanded for further proceedings.

IT IS SO ORDERED.

Dated this <u>     8th     </u> day of March, 2010.

<u>    /s/ Garr M. King                    </u>
Garr M. King
United States District Judge

Page 15 - OPINION AND ORDER